Our last case, Yang v. Holder, No. 13-1682. Good morning, Honors. May it please the Court, my name is Joshua Vardavid, co-counsel to Petitioner Mr. Yang. Mr. Yang did not commit fraud for the purposes of gaining a benefit under the Immigration and Naturalization Act. Can I ask you one question? Sure. I call him Mr. Yang and you call him Mr. Yang, but is it, in some cultures, the first name is the name that's used? Like, if he was in this room, would we call him Mr. King? You would usually use the surname first and then the first name, our first name, last. So it would be Yang Shin, but it would be Mr. Yang still. That is his family name, so it's Mr. or Mrs. family. He did not commit fraud for the purposes of gaining a benefit under the Immigration and Naturalization Act. And even assuming arguendo that he did, the Board of Immigration Appeals abused its discretion in denying the motion to remand to consider the new and previously unavailable evidence. Can you start with the fingerprint problem? Yes. Because I'm not sure I don't agree with you about the fraud, but you have been here earlier today and you know about creating circuit splits. Yes. And wouldn't we have to create a circuit split to go your way on the fingerprint issue? No, Your Honor, because I believe you're referring to the Fifth Circuit's decision. I think there are a bunch of circuits that are on it. The one constant is the regulation in question, which is HCFR 100.47, which specifically requires the department to notify the respondent, Mr. Yang, that his fingerprints have expired. Basically, in order to run a background check, they need to be refreshed every certain amount of time. The regulation that we cite, HCFR 100.47, I believe it's subsection D, is that requirement, and there is nothing in the record and there's not even been a finding that DHS, in fact, did notify Mr. Yang that his fingerprints had expired. The IJ is saying make sure your client has current fingerprints at the pre-hearing scheduling conference on April 19, 2010. And then saying she told him if your client presents himself with expired prints and biometrics, then the applications will be dismissed for failure to prosecute. And saying, is that understood? And having counsel respond yes? Yes, Your Honor. Does it not fulfill those requirements? No, that does not, because that doesn't tell him when his prints expire. Just that he's required when they are expired to, in fact, get them renewed, because he had previously done his fingerprints. And at no point in the record— It would seem to me that the when would be implicit. You know, have to get them when the others are expired. And when did they expire? We don't know. That's not part of the record. No one knows. It hasn't been indicated when they expired. Because they only stay valid for a certain period of time, and a lot of this deals with the machinations of DHS and doing the FBI background checks, the respondents are often in the dark. And there's a requirement that the DHS counsel put into the record and provide notice when those prints have expired. Therefore, the respondent, Mr. Yang, can then go and redo his fingerprints. And again, there is not a single document in the record, and the IJ does not cite to a single document in the record that indicates that Mr. Yang was providing notice of when they did expire. Because again, they only stay good for a valid period of time. And I would also note that we raise— I just want to be sure I understand your argument. What regulation is it that you cite that says it has to be in writing? Is that your point, that this notice had to be in writing? That is correct, yes, Your Honor. So what regulation says that? That's 8 CFR 103.47, subsection D. And we cite to that, and we provide an argument. I would also note that we made this argument— According to you, it says that the statement must be in writing. That is correct, Your Honor. Okay, is that—do you have it quoted somewhere? It is quoted in our brief, I believe on page 29 of our brief. Well, I don't see the requirement says, but I'm— Where does it say it has to be in writing? Within the time— Writing is not in there, is it? I'm sorry, it's quoted on page 29. An applicant's failure to update biometric data within the time allowed by the immigration judge's order constitutes abandonment of the application. So within the time allowed. So the IJ has to specify— So it doesn't say anything about writing. We're both on the same page there, right? Yes, but— Okay, so it's your contention that it doesn't say— But the language I read, you did say that. Make sure your client has current fingerprints. I mean— If your client presents himself with expired prints in biometrics. And again, I would assert, Your Honor, that he has to be made known— That was understood. I mean, she said to the counsel, I assume you didn't handle it well, maybe you did. Is that understood? Counsel said yes. And he—but again, IJ Doernell did not make him known when they expired. She did not specify a time. She just said when they are expired. But all the rec says is within the time allowed. And the IJ did not— By the order. And this is the order, within the time allowed. It has to be current. I understand. But again, she didn't specify the time. And the second point is, Your Honor— Why wouldn't the lawyer understand that? It's specified current. So the lawyer should have said, no, what do you mean, what time? That could have been made more clear. But again, since the regulation puts the onus on the immigration judge to provide that notice, and the immigration judge didn't provide the notice— The lawyer said you understood. And the lawyer said yes, understood that when the fingerprints expired. That's your predecessor's lawyer. You stand right in his or her shoes. I understand, Your Honor. Are you pursuing an ineffective assistance claim here? No, Your Honor. I don't mean before us, but I mean, is that contemplated? Because isn't that your client's problem more than anything else? The abandonment of the application? Well, one, that was remedied— No, I mean the performance of counsel. I understand counsel in this case was, correct me if I'm wrong, disbarred. That is correct, Your Honor. Yeah. Did counsel even raise the fingerprint issue before the board? It was raised subsequently in the motion to remand. And I would assert, more importantly, Your Honor, that— Was it timely raised? I would say that, yes. The motion to remand was filed while the appeal was pending. So the argument was timely raised on appeal before the board, yes. And I would also assert, Your Honor, even assuming arguendo that there was an issue of abandonment, I would assert that the government has waived this argument. In fact, we raised this in our brief, and we state that it was the immigration judge's obligation to provide the date. The government did not respond to that argument in their brief. And so to the extent that— They just ignored you? Yes, Your Honor. That is not an argument section, and it's not raised in their arguments whatsoever, the issue of abandonment. And therefore, although they stated in the statement of facts, it's in no way discussed in our citation and reliance on 8 CFR 1003.47d. It's not discussed whatsoever or rebutted by the government. So to that extent, I would assert that it's waived. With respect to the waiver, the denial of the motion to remand, it's respectfully asserted that the Board of Immigration Appeals erred in viewing this evidence as not new and previously unavailable, that if you look at page 52, which is the medical record for the mother provided prior to the March 2011 hearing, it's a January 2011 medical record, and compare it with pages 48 to 51, which are medical records provided after the March 2011 hearing, we see that the mother has developed additional ailments. She has now difficulty breathing, chest pains. She has now been diagnosed with sciatica. And there were a couple of other things that we point out in our brief. Now, whether or not this is sufficient for prima facie evidence to warrant a new hearing is a different question as to whether or not it's new and previously unavailable. Undoubtedly, these conditions are new. The Board said this evidence was not new and previously unavailable, and that was the only reason that they denied it. Because these conditions undoubtedly are new, the matter should be remanded at the very least for determining whether or not they're sufficient to warrant a new hearing, considering that the result may be different in light of the mother's worsening health conditions and in light of the development of some mental health issues for which a psychological report was provided. Finally, Your Honors, turning to the negative credibility determination, the most important thing from the get-go is the fact that a negative credibility determination is not a conclusion that an individual has committed fraud or a material misrepresentation. Asylum law has a totally separate provision for making such a determination, and that is the frivolous requirements, that if an immigration judge is going to find that an individual has in fact committed fraud or a material misrepresentation, essentially that their application was made up. USC 1158D6 provides that, and a judge can make a frivolous asylum finding. And upon that finding, the alien would then become ineligible for any kind of future relief under immigration law. There was no such frivolous finding by I.J. Dornell, either at the 2008 hearing or at the 2011 hearing. Therefore, the negative credibility determination, which we discuss in greater detail in our brief, is insufficient to reach a determination that Mr. Yang committed fraud or a material representation, but rather that the bases provided were a product of either mistake, misunderstanding, the fact that his original asylum application wasn't translated back to him and it was in English, and he undoubtedly didn't speak English. I do want to just discuss one specific point that was raised in the negative credibility determination, which seemed to be the primary factor, which was his demeanor. But the immigration judge misrepresents the record in a significant way. She points out that, you know, supposedly Mr. Yang tried to signal his mom when she was testifying, and I.J. Dornell found this relevant because she said that he was doing it and then his mom changed her testimony. But, in fact, if you look at the record, her testimony on page 1304 and 1305 is when she cautions him about signaling. This occurs way before his mother discussed anything about where she lived or who lived with them. How can we possibly, I mean, I appreciate your argument, but we weren't there. We didn't see this. I completely agree, but that's why the misreading of the record is so important. I don't understand how you can call it a misreading. You know, the I.J. sitting there watching what's going on, we don't know how much time passed between certain behavior and when the I.J. decided to put it on the record. But the point is when it was put on the record was at the very beginning of her testimony, well before she even discussed first saying that she lived in Albany and then changing her testimony to saying that she lived in Maryland. So since the I.J. attributed this hand signal to what caused her to change her testimony, there's no way the mom could have changed her testimony because she hadn't even testified to the erroneous information to begin with. That testimony occurred in the transcript several pages later. So it's the misreading of the importance or the purpose of the hand signaling that makes it. What do you suggest is the purpose of the hand signal? I honestly don't know because I wasn't there. But what's important is that we know that the I.J.'s reading of it cannot be correct because the hand signal occurred well before her original testimony or the change in testimony. In fact, he's given hands or she's given hands to say those is, we got to rely on that. That's not a record. One, you'll testify to this and two, you'll testify to that, even if you haven't testified before. I mean, that could be. We just don't know. And I agree. And I agree that that can be a factor. But what the I.J. attributed it, why she caused it, called it relevant, is simply cannot be correct. So at the very least. Can't be relevant, you're saying. You say it can't be a change in testimony because there was no testimony at that point. On this point. On this point, exactly. And so at the very least. Might have changed something else. It was so early in her testimony. I mean, yeah, okay, even if that's the case, that's not what the I.J. found. And this court is bound by the agency's determinations. And since the agency's determination was based on a misreading of the record, at the very least it should be remanded for a determination. It does seem, if you read the record, that your client talked to his mother just before she was testifying and then even when she was, after she'd been sworn. And that's what the I.J. was really worried about. This is the second time I'm telling you you're not to speak to the witness while she's in the courtroom testifying as a witness. Do you understand? No, I totally understand what Your Honor is saying. And it can be a cause for concern. But what the I.J. attributed it to for the cause in the mom's change in testimony simply can't be correct. And therefore, I think a remand would be appropriate on that issue. Thank you. Thank you. Good morning, Your Honors. May it please the court. My name is Carrie Monaco, and I represent the respondent, Attorney General Eric Holder, in this matter. This immigration case, the government urges the court to deny the petition for review because the adverse credibility determination is supported by substantial evidence. And as a result of those amply supported adverse credibility findings, the agency did not err in concluding that the petitioner made willful misrepresentations when he filed his claim for asylum. And due to these willful misrepresentations, the agency did not err in concluding that the petitioner was inadmissible for purposes of adjustment of status without securing a waiver. Have you abandoned the fingerprint argument? We don't think that it's necessary for the court to reach that issue. I understand that, but what if we did? It would be the cleanest way to do it, certainly. Pardon? It would be the cleanest way to do it. I mean, for example, if we should conclude that there wasn't evidence of fraud here, but we would lumber through this record and say, yes, okay, there is a basis for the denial of whatever you call it. The inadmissibility finding? Yes. For adjustment? I mean, that seems to me to be a big slog. Yes, and we agree that the petitioner was certainly on notice of his requirement to obtain fingerprints or make sure that they were current by the time his adjustment of status hearing rolled around. However, we also noted, as my opposing counsel pointed out, we recognize that there is language in the regulation, and I think my opposing counsel might have quoted the incorrect section. There is a section of the regulations that require DHS to provide notice to the petitioner with instructions on how to obtain new fingerprints. That is 8 CFR 1003.47D. And without having the board address that specific regulation, which my opposing counsel raised in his opening brief, is the reason we did not address it in this case, but we don't think that the court needs to reach it because of the other findings on the adjustment application are dispositive. We appreciate your candor. Yes. Actually, he does quote it on 29, but I was going after him pretty hard. Read me the wrong thing. Very understandable. So you think the fact that the agency did not provide instruction to the respondent for such a procedure was made this? We're not saying that it was necessarily error in this case, particularly given the petitioner's warnings at the previous hearing. However, if the court felt the need to address that issue, I think it's best if the board had another opportunity to address the abandonment issue in the context of this language, the regulation language, which they did not do. And the IJ didn't either. Do you think remanded for the board to address that? But again, we don't think remand is necessary because of the other dispositive issues in this case. And that because the adverse credibility finding is supported by substantial evidence. And because those findings also reasonably led to a finding that the petitioner had willfully misrepresented his asylum claim. So suppose we didn't, we find there isn't evidence of willful. If the court finds that the fraud, the inadmissibility finding is in error, then yes, we would agree with the court that remand is necessary for the board to address whether he abandoned his adjustment application and also address the merits of the adjustment application, whether he otherwise qualified for adjustment if the court were to find that a waiver was not required. But again, it's the government's position that based on the adverse credibility factors that the immigration judge in the board were correct in determining that he required a waiver of inadmissibility for purposes of adjustment. And the strongest finding in the adverse credibility context is in fact his demeanor. And I'd like to address my opposing counsel's argument in his opening about the nature of the record and what's on the record with respect to the demeanor. And he is correct that the immigration judge notes in the hearing transcript at the beginning of the mother's testimony that he was signaling to her in some way. There are no further references to hand gestures or signals during the mother's testimony, at least not in terms of the transcript. However, in the immigration judge's oral decision, she specifically notes that he had signaled to his mother at the points at which she changed her testimony on two different occasions. So you think that's a different point that she just decided not to comment on when she, when the witness was changing the testimony, but did comment on at the beginning of the testimony? That seems unlikely. Well, yes, agreed that it would have been helpful if that had been noted in the record. However, there's no reason to have to admit that that reference in the opinion is not supported by the record. There is no, yeah, there's no, I don't dispute that there is no reference in the transcript to there being hand gestures. At a crucial time. No hand gestures. To change the testimony. Right. There is no reference to the hand gestures. Are you allowed to do that? I mean, not reference it in the record, but then come back in the opinion and say, I saw him doing it anyhow. I mean, there's no reason to think that the immigration judge cannot do that. Again, we were not present, but the judge rulings have to be based on the facts in the record. Well, in this case, most all courts that I've heard of, maybe these kind of proceedings are different. Well, in this case, the immigration judge is basing it on what she personally witnessed during the hearing. And what I can guess may have been notes that she made during the hearing, referencing his change of testimony and the signals that have, or I'm sorry. It does seem unlikely that she would comment on the first two questions that there's signaling and not comment. If the person was actually changing testimony, the witness was changing testimony with regard to signaling. So it seems more likely that she'd misremembered. Well, in the first instance, she's directly talking to the petitioner. And in the second instance, it appears that this may have been communication just going on between the petitioner and the witness. And again, there's no, that was really going on and she didn't note it after having noted that the first time it seemed like she had probably taken some further action and barred him from the room or something. But again, strong deference should be given or trying to tell her mom what to say. Strong deference should be given to the immigration judge with respect to what she saw during the hearing and what she outlines in her decision. But even without the demeanor findings or even, you know, moving past the demeanor findings for a second here, there are numerous other inconsistencies in the record that support both the adverse credibility determination and the finding that the petitioner willfully misrepresented his asylum claim. But you think if all they do is support an adverse credibility finding, we have to remand? No, I think I'm misunderstanding your question. In other words, if we find there's not evidence of fraud, we have to remand. There's not sufficient evidence for fraud. If there's not sufficient evidence of fraud, are you asking whether that means that there's not sufficient evidence for credibility finding? Is that your question? No. In response to an earlier question from me, I thought you'd said if we should find there's not sufficient evidence for fraud finding here, we would have to remand. That's correct. That's correct. And we'd remand for what? Would remand for the agency to, if the court finds that there's no fraud, then essentially the court is finding that the agency erred in denying his adjustment application for lack of admissibility. And so the case would need to go back for the agency to address whether he is eligible for adjustment because what happened here was the immigration judge and the board found that he was not eligible for adjustment because he was inadmissible and therefore required a waiver, which required him to prove hardship to certain U.S. relatives. And so if you find that there's no fraud, then the finding of the waiver requirement is also an error because that was the basis for the waiver, was the inadmissibility finding and the fraud finding. And so the agency would then need to address the other elements of adjustment and whether he otherwise meets the requirements for adjustment. On the merits of the adjustment? On the merits of the adjustment and in the matter of discretion. And in the matter of what? And in the matter of discretion. I'm sorry, I didn't hear you. And in the matter of discretion because adjustment is a discretionary form of relief. So that's your alternative request here today? I mean, yes. If, I mean, because those are the only issues. If you lose on the fraud claim. Yes, the only. It goes back. That's the only issue that's before the court. Or fall back is. Right, that's the only issue. Send it back and let us do some more work on it. Can you refresh my recollection to the extent I ever had insight into this? When does ineffective assistance of counsel come before the agency, if ever? In a case such as this?  And this petitioner would have that available? If he could, he would. I mean, if it goes back, he could. In theory. He could raise that. In theory, yes, but a motion to reopen is due within 90 days of the final order of removal, unless he can show that there was a reason he couldn't file within 90 days. Well, he was represented by a. But in this point, he's changed counsel a couple of times since then, so I think he'd have a hard time proving due diligence in pursuing that claim. What if everybody but present counsel provided ineffective assistance? Again, he would have to show that he. He'd have to show that it was ineffective assistance by every subsequent counsel who failed to raise ineffective assistance in a timely fashion. Essentially, yes, and that he was diligently pursuing an ineffective assistance claim and prove when he learned of the ineffective assistance and that he diligently filed a motion to reopen. But as my opposing counsel admitted, they have not pursued that or filed one. And as I was mentioning, I'd like to go back to the adverse credibility and fraud finding for a second and note the other inconsistencies in the record, which are very dramatic  The first being that he gave completely different accounts of whether he engaged in political protests in Beijing in 1989. Considering his initial asylum claim was based exclusively on his political activities in China, whether he went to Tiananmen Square and participated in political protests there is a dramatic inconsistency. Is that inconsistency enough standing alone to prove the fraud claim? I mean, I think it is certainly evidence that there is willful misrepresentation in this case. That's another point I want to make too. Is that enough standing alone? I would argue yes. Yes, that's a very dramatic inconsistency. That's the Attorney General's position. You don't need any of this other stuff about the hand signals in the hearing room and all that stuff. The fraud on the Tiananmen Square incident is enough. It's certainly evidence of willful misrepresentation, and that's one thing I want to point out. I'm trying to find out what your position is on whether it's enough standing alone. If you lose on the hand signals and stuff like that because the judge didn't make proper references, etc., then you still win on this other stuff. Yes, and I'd like to make clear to the court that the inadmissibility statute we're looking at here does not definitively require the court to find that there was fraud. The inadmissibility statute renders the petitioner inadmissible if he committed fraud or willfully misrepresented a material fact in pursuing an immigration benefit. And so a finding of actual fraud is not required. He still can be deemed inadmissible for willfully misrepresenting a material fact. That sounds like about the same thing. Yeah, what's the difference? Well, I think what we're looking at here are specific inconsistencies on material elements of his asylum claim. It doesn't necessarily need to be a definitive finding that every aspect of his claim, for example, was fraudulent or that the entire claim was fraudulent. It's about whether he bolstered material elements in order to pursue asylum would also render him inadmissible. But on the Tiananmen Square stuff, when it says it has to be a willful misrepresentation, how do you get past willful with all the language problems and all that? Well, he had his— It might be a negligent inconsistency as opposed to a willful misrepresentation. Well, in his written asylum application, he mentions twice that he went to Beijing and participated in the protests there. And that was prepared with the assistance of an attorney. And when he went to his hearing and testified, he claimed, no, no, I never went there. One of those two things cannot be true. And so by either putting it into a written asylum application or testifying about it, one of those is a willful misrepresentation. And the same is true with the inconsistencies relating to the testimony with the mother, is that the mother and the petitioner were inconsistent about where his children's mother lived and even where the petitioner's mother lived. The petitioner testified that— Y'all thought they were lying about that, too. Pardon? Correct. And the mother was very inconsistent and lacked credibility on both of those issues, both where she lived. First, she testified that she lived in Albany with her daughter, and then she immediately changed her testimony to say she lived in Maryland with the petitioner, whether signaled or not. Wait, was it both places? Well, but it's relevant to whether she's the caretaker for these children, and that was relevant to the claim that the petitioner would take his children back to China with him or may have to take the children back to China with him. And that's an issue that the witness mother would know, exactly who she's living with and in what state she currently lives. So that's one major problem. But the bigger problem is the fact that the petitioner testified that his children's mother was nowhere to be found, and then when the petitioner's mother got on the stand, Ms. Lynn, she testified that the children's mother lives with all of them in Maryland and works at the same restaurant as the petitioner. And whether a signal or not, the immigration judge references that there was a signal at this point in her decision, but it's not in the record, so even if we assume there's no signal, the petitioner then changed her testimony when confronted with this inconsistency. Oh, no, the mother is nowhere to be found. I'm sorry, the mother. The mother then changed her testimony saying that the children's mother is nowhere to be found. There's a problem with the translation from the mother's testimony, right? There's, like, it's not the right dialect. The dialect was confirmed at the beginning of the mother's testimony, that the appropriate interpreter was present. I thought I remembered. I thought there was some discussion about what the interpreter herself said. She's not speaking Mandarin. Right. She's something else. She speaks something else. And they thought they could make do with this, but it's a big mess. The petitioner's attorney indicated that a Mandarin interpreter was appropriate and continued the testimony. Petitioner or ineffective assistant. But, again, these were all issues that the petitioner's mother would know and had firsthand knowledge of of where she was living, who she was living with, and who was present in the household. How old was she at the time, the mother? Well, she is currently 69, I believe, so at the time of the hearing, she would have been in 2008, so early 60s, early to mid-60s. And so for those reasons, the government argues that the adverse credibility determination and the inadmissibility findings are supported by substantial evidence. I just want to touch briefly on the motion to remand in this case and point out that the petitioner, in his motion to remand, seeking to present additional evidence of hardship, never made the argument to the board that her medical conditions were deteriorating, never made the argument to the board that these were new medical conditions. In fact, all of the language of the motion to remand itself refers to the medical conditions in the present tense. And when you look at the medical reports included with the motion to remand, a lot of the ailments are the same throughout, and even a lot of the new ones, such as lower back pain and sciatica, reference a period of time in which they began, such as low back pain for the last two weeks, which implies that those were not necessarily ongoing chronic conditions or evidence of a deteriorating condition, because they're sporadic throughout the medical records. And they appear, and then they're gone for the next record, and then they reappear again. And the same is true with the psychological evaluation. There is no mention in the psychological evaluation when the mother's emotional ailments began, and to the extent my opposing counsel is arguing that they were caused by the petitioner's immigration proceedings, there's no explanation for why they would have started at this stage of his proceedings. He initially suffered a removal order in 1996. These have been going on for 20 years, and there's been no argument made as to how these emotional conditions are new and previously unavailable, and could not have been presented during the proceedings in which he was seeking the waiver initially. And so for these reasons, unless the court has other questions for me, government rests and urges the court to deny the petition for review. Thank you very much. First, I do want to apologize for quoting the wrong section. Just very briefly, Your Honor, I would assert that given the great importance that the immigration judge placed on the so-called demeanor finding, and given that the record doesn't support the demeanor finding, we can't be certain whether the judge would deem this sufficient for fraud finding. And I would assert that this court need not push that determination of whether it is sufficient for a fraud finding, as the agency should be given the opportunity to review that absent the errors made in the first instance. With respect to the motion to remand, it was asserted on page 24 and 25 that this was, in fact, new and previously unavailable evidence of her medical conditions, and the attached medical reports, the reason for providing one prior to the hearing and then four or five after the hearing to demonstrate the new conditions. The record certainly does support a showing that the agency was presented with the argument that this was new and previously unavailable evidence. Unless the court has any additional questions, I'll rest on our brief. See, the one thing about that is that I think you can read that is the records weren't available before, but not that the condition was not present before. Do you understand what I'm saying? I mean, when I first read it, I thought, well, why didn't they put the records in before? Well, the records weren't available to them. But I understand the argument you're making, but it doesn't quite do the trick, I'm not sure. Given that the medical evidence could have been presented, undoubtedly, and I agree that it was ineffective assistance of counsel, that it wasn't back in 2008. Unfortunately, we do have a due diligence issue. Clearly, counsel hadn't met the mother. Didn't know what dialect she spoke. That's correct. And the mother does indicate that she – sorry, the interpreter does indicate that the mother was having trouble understanding the testimony, and I believe that was around page 1280. I can provide the exact case site in a letter if the court would prefer. But, yeah, it's very clear that the attorney didn't prepare this case well. Unfortunately, there is a requirement of due diligence in pursuing ineffective assistance. But, nevertheless, the medical records – she did have some conditions, but the medical records show she has significantly more diagnosed disorders post-March 2011. And that's why the prior, the January 2011 medical report was included, as well as the post-2011 medical report. Unless the court has any further questions, we'll rest on the brief. Thank you very much. Thank you. We will ask our clerk to adjourn court, and then we'll come down and greet the lawyers. This honorable court stands adjourned until tomorrow morning at 9.30. God save the United States and this honorable court.
judges: Diana Gribbon Motz, Robert B. King, Andre M. Davis